Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Robert W. Gettleman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 7794 | **DATE** | Feb. 26, 2002 |
| **CASE TITLE** | Anna L. Hubbard  v  Van Ru Credit | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

memorandum opinion

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry]   Memorandum opinion and order entered. Accordingly, defendant's motion for summary judgment is granted.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | number of notices | Document Number |
| X | Notices mailed by judge's staff. | | FEB 2 8 2002 | |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | | 31 |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| GDS | courtroom deputy's initials | 02 FEB 28 AM 8:15 | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED

FEB 28 2002

ANNA L. HUBBARD,

    Plaintiff,

v.

VAN RU CREDIT CORP.,

    Defendant.

No. 00 C 7794

Judge Robert W. Gettleman

## MEMORANDUM OPINION AND ORDER

Plaintiff Anna Hubbard has filed suit against her former employer, Van Ru Credit Corporation, alleging that she was terminated due to her national origin (Mexico) in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq* ("Title VII"), and Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. §1981 ("§1981"), and also due to her sex in violation of Title VII. Defendant moves for summary judgment of the instant suit pursuant to Fed. R. Civ. P. 56, arguing that plaintiff has not established a *prima facie* case of sex or national origin discrimination and, even if she has, she has not proved that defendant's legitimate, nondiscriminatory reason for firing her was a pretext for discrimination. See Anderson v. Baxter Healthcare Corp., 13 F.3d 1120, 1122 (7th Cir. 1994). For the following reasons, defendant's motion is granted.

### FACTS[1]

Plaintiff, who was born in Mexico and has been in the United States since she was five or six years old, has been a citizen of this country since the 1980's. In October of 1997, plaintiff was hired as a collector by defendant, a business that collects debt for governmental and private

---

[1] All facts are undisputed unless otherwise noted.

entities. As a collector for defendant, plaintiff was trained to understand and adhere to the requirements of the Fair Debt Collection Practices Act, 15 U.S.C. §1692 *et seq.* ("FDCPA"), which was passed by Congress in reaction to "abundant evidence" that the use of "abusive, deceptive, and unfair debt collection practices by many debt collectors" was contributing to "the number of personal bankruptcies, to marital instability, to the loss of jobs, and to invasions of individual privacy." See §1692(a). In particular, plaintiff was taught that §1692(c) of the FDCPA provides:

> Without the prior consent of the consumer given directly to the debt collector or the express permission of a court of competent jurisdiction, a debt collector may not communicate with a consumer in connection with the collection of any debt . . . (3) at the consumer's place of employment if the debt collector knows or has reason to know that the consumer's employer prohibits the consumer from receiving such communication.

Plaintiff also received a copy of the FDCPA when she was hired and thereafter attested to the following:

> I HAVE BEEN INSTRUCTED, AND HAVE READ THE LAWS THAT GOVERN THE COLLECTION INDUSTRY, KNOWN AS THE [FDCPA]. I AM FULLY AWARE THAT I MUST ALWAYS ABIDE BY THESE GUIDELINES. I HAVE ACCESS TO THE MOST CURRENT EDITION OF THE [FDCPA], AND KNOW THAT IF I HAVE ANY QUESTIONS I AM TO REFER TO THIS EDITION AND/OR MY SUPERVISOR.

In addition, plaintiff was given a copy of defendant's employee manual (the "Manual") and was asked to read that document prior to signing an "Employee Acknowledgment Form" which verified that plaintiff accepted responsibility for reading and complying "with the policies contained in [the Manual]." Plaintiff signed the acknowledgment form. Section 701, Guideline

3, of the Manual concerning "Employee Conduct and Work Rules" provides the following punishments for "intentional violation of state and federal laws and regulations":

| 1st Offense | 2nd Offense | 3rd Offense |
|---|---|---|
| Written Warning or Discharge | Written Warning or Discharge; Retake FDCPA Test & Pass; 2 days suspension without pay and loss of bonus per each department's policy | Discharge |

Also on the day she was hired, plaintiff was provided with and signed defendant's policy regarding account documentation, which stated:

> ANY EMPLOYEE FOUND TO BE FALSELY DOCUMENTING ACCOUNTS WILL BE SUBJECT TO IMMEDIATE DISMISSAL. REPORTS ARE RUN TO MONITOR ALL TRANSACTIONS (FILE COMMENTS, TELEPHONE, ETC.) AND AUDITED ON A REGULAR BASIS. VAN RU HAS BUILT IT'S [SIC] REPUTATION ON HARD HONEST WORK, AND WE INSIST OUR STAFF BELIEVES IN THIS PRINCIPLE. **PLEASE DO NOT RISK YOUR JOB!!!**

Likewise, plaintiff was given a copy of defendant's "Rules for Professional Conduct" ("Rules of Conduct") which provide, in part: "ALL VAN RU collection personnel are specifically prohibited from the following practices: . . . 6) Contacting the debtor at his place of employment, if there is reason to believe the employer does not permit contact, or the debtor requests no contact be make [sic]."

All newly-hired collectors for defendant receive two weeks of training and must pass a test on the FDCPA before they are allowed to work as a collector. During this training period, the collectors review the FDCPA, defendants' Rules of Conduct, and the Manual. Plaintiff admits that she was taught during this training period that if the debtor requested not to be called at work, she was supposed to insert the code "J" (which stands for "NO JOB CALLS") into the

computer record of debtor's account so the computer would flash not to call the debtor's workplace whenever accessed. According to defendant, it has an unwritten policy that if a debtor changes his or her mind and gives permission for work calls that he or she previously sought discontinued, the collector is supposed to make a written notation of that change of permission in the debtor's computer record.

Plaintiff was assigned and always used the alias "Miss Carrion" when contacting debtors. Plaintiff's unique, password-protected computer user sign-on was "I63." This code, which plaintiff was told not to share with other employees at the risk of termination, appeared on her computer screen at all times.

As a collector for defendant, plaintiff's performance was mixed. Plaintiff emphasizes that she received two Certificates of Achievement reflecting her collection of more than 230% of her minimum required goal. Additionally, plaintiff notes that on September 18, 1998, she received the following letter from defendant's President and CEO:

!!!OUTSTANDING ACHIEVEMENT!!!

Dear Anna:

I would like to extend my personal congratulations to you for the exceptional job you have done. I truly appreciate your hard work and dedication and commend you for putting forth that extra effort to rise above the crowd.

Keep up the great work and once again, your efforts are appreciated.

Finally, plaintiff notes, at the end of 1998 she was given an 8.33% raise and the individual recommending that action wrote: "Employee is #1 in open accounts in the last 3 months, #1 in fees for the same period and #2 in postdated checks. She has shown great effort

4

and I am recommending a [salary] increase of 8.33%." No negative comments or suggestions for improvement appear on plaintiff's change of status form.

During the same time period that plaintiff received the above commendations, however, she also received warnings for improper behavior. Sometime prior to January 22, 1998, plaintiff received a verbal warning for misdocumenting a debtor's account. Plaintiff admits that she was "known for not documenting [her] accounts properly." Then, on January 22, 1998, plaintiff received a written warning for violating the FDCPA and Section 701, Guideline 3, of the Manual. This second warning advised that, "continued FDCPA violation will result in further disciplinary action up to and including termination." Thereafter, on October 26, 1998, after she was monitored by her supervisor, Curtis East ("East"), plaintiff received a second written warning and was suspended for two days for again violating Section 701, Guideline 3 of the Manual, as well as for rude, abusive or unprofessional conduct.

According to plaintiff, she was told that the first warning (the verbal warning for failure to document her accounts properly) and the third warning (the written warning that included a two day suspension) were going to be thrown out "after so many days," and that she understood this to mean that the warnings would be erased from her file eventually. Plaintiff does not identify the person who told her this or when she was told this. The written warning that plaintiff received provides: "This warning will be in effect for the next 90 days. 4/22/98"

On July 22, 1999, plaintiff was notified verbally that she would have to retake the FDCPA test. Though plaintiff admits that the reason she was given for having to retake the FDCPA test is because she had violated the FDCPA again, plaintiff maintains that another collector worked that same account and that he was responsible for the FDCPA violation.

5

According to the affidavit of John Kacinas ("Kacinas"), who was Branch Manager of the facility where plaintiff worked during the relevant time-period, he was aware that defendant had received "at least two complaints from debtors that [plaintiff] had been rude and obnoxious to them" prior to September 9, 1999.[2] Kacinas avers that he spoke to plaintiff about these allegations and "warned her that she could not speak to debtors in such a matter and that if she continued to do so, she would be fired."

Then, on September 9, 1999, defendant received a call from a debtor's employer, United Student Aid Funds ("USAF"), which also happens to be a large client of defendant. The USAF representative complained that one of defendant's collectors who identified herself as Miss Carrion had called one of its employees (defendant debtor #EY6280; "Debtor") at work on several occasions, contrary to directives.[3] The USAF representative asked Kacinas to call the Debtor for details. Immediately thereafter, Kacinas opened the Debtor's computer file—assigned to the queue "HE," which was plaintiff's group of accounts during her employ with defendant—and made a notation that only managers could access Debtor's computer file. Then,

---

[2] Plaintiff objects to this testimony, arguing that it is "inadmissable hearsay to the extent that it refers to alleged complaints from debtors that were made to unidentified [defendant] supervisors and managers and then reported to Kacinas." Because the rules of evidence apply to affidavits such as Kacinas', plaintiff certainly has the right to make this argument. See Fed. R. Civ. P. 56(e). However, the court disagrees with plaintiff that defendant is using this testimony to prove the truth of the matter asserted (i.e., that plaintiff had been rude and obnoxious to debtors). See Fed. R. Evid. 801(c). Instead, these statements are being used to show the effect that they had on the listener, in this case Kacinas, who was instrumental in the decision to fire plaintiff. See United States v. Hanson, 994 F.2d 403, 406 (7th Cir.1993) ("An out of court statement that is offered to show its effect on the hearer's state of mind is not hearsay").

[3] Plaintiff also objects that Kacinas' account of his conversation with the Debtor is hearsay, but that objection is overruled for the same reasons expressed in the court's ruling on the hearsay objection above.

Kacinas called Debtor, who he says complained that Miss Carrion had called her at work on several occasions despite having been told not to. According to Kacinas, he was very concerned about Debtor's complaints because, if true, defendant potentially faced a suit under the FDCPA by Debtor, as well as the probable loss of a major client, USAF, due to defendant's violations of federal law. Kacinas then spoke to Alan Jacobson ("Jacobson"), who was Special Project Manager at the Illinois facility and had at least five years of experience working for defendant. Specifically, Kacinas asked Jacobson to review Debtor's account and give him an assessment of the situation.

Upon review of Debtor's file, Jacobson noticed that the account had been initially documented with a "J" ("NO JOB CALLS") by another employee, who had handled the account before plaintiff, and that thereafter, the "J" code was removed twice and more than four calls were made to Debtor's place of employment. There was no documentation in Debtor's file reflecting that plaintiff had been given permission to call Debtor at her workplace. Further, several times, after calling Debtor's workplace, plaintiff replaced the "J" in Debtor's computer record.[4] Jacobson reacted to this finding by concluding that he had never seen an account where it was "so clear that the intention [of the collector] was to get the [d]ebtor to pay, no matter what."

---

[4] Specifically, the computer log of Debtor's file indicates that the collector identified as HE (plaintiff's group of accounts) and 163 (plaintiff's personal, password-protected identification number) had removed the "J" code from the computer on July 14, 1999, called Debtor at work on July 14, 21, and 28, 1999, and then recoded the account with a "J" on July 28, 1999. Then, on August 31, 1999, the same collector (group HE, identification number 163) again removed the "J" code, called the Debtor at work on September 7, 1999, and then immediately recoded the account "J" that same day.

7

Plaintiff maintains that she was given permission from the Debtor to call her at work. Plaintiff also asserts that, although she did not write, for example, "given permission to call Debtor at work" into the computer file, her removal and replacement of the "J" provided that notice. Further, plaintiff points out, there is no evidence of any written policy requiring, or any instruction given to collectors advising, that a notation be made whenever collectors are given permission from a debtor to call them at work.

Later that day, Jacobson reported his findings to Kacinas, characterizing plaintiff's activity on Debtor's account to be intentional, especially given her experience as a collector and her ample training. Kacinas agreed with Jacobson's assessment. Jacobson recommended and Kacinas agreed to fire plaintiff, in accordance with Section 701 of the Manual. Kacinas asserts that, when reaching his decision, he also considered the number of warnings he had given plaintiff in the past.

Plaintiff was asked into Kacinas' office with Jacobson present. Kacinas then explained the call from the USAF representative and showed plaintiff the activity she recorded in Debtor's computer record (specifically the removals and replacements of the "J"code). According to Kacinas, plaintiff "admitted that she had done that and said it was 'stupid' of her." Plaintiff denies that claim, saying that she thinks she told Kacinas that Debtor had given plaintiff permission to call Debtor at work. Kacinas testified that plaintiff never told him that. At any rate, it is clear that neither Kacinas nor Jacobson referred to Plaintiff's gender or national origin/ancestry during this meeting. Plaintiff's termination notice indicates that she was fired on September 9, 1999, for intentionally violating the FDCPA.

8

Kacinas avers that in his capacity as Branch Manager, he decided to terminate the employment of many employees for violating the FDCPA. According to Kacinas, some of those terminated were men, some were women, some were African-American, some were white, and some were Hispanic. Terry Oritz ("Oritz"), defendant's Human Resources Manager from September 1998 to September 1999, has reviewed defendant's records and submitted an affidavit attesting that in 1999, defendant employed 288 people at its Skokie facility. Of those, 133 were male, 155 were female, 64 were white, 173 were black, and 46 were Hispanic. Similarly, Oritz avers that from January 1, 1999 to September 10, 2001, defendant terminated 17 people including Plaintiff for violating the FDCPA. Of the 17, 12 were male, five were female, three were white, 13 were black, and only Plaintiff was Hispanic. Jacobson testified at his deposition that, besides plaintiff, of the five collectors terminated from defendant's Skokie facility for violating the FDCPA in 1999, two were white males, two were black males, and one was a black woman.[5]

## SUMMARY JUDGMENT STANDARD

A movant is entitled to summary judgment under Rule 56 when the moving papers and affidavits show there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Unterreiner v. Volkswagen of America, Inc., 8 F.3d 1206, 1209 (7th Cir. 1993). Once a moving party has met its burden, the nonmoving party must go beyond the pleadings and set forth specific facts showing there is a genuine issue for trial. See Fed. R. Civ. P. 56(e); Becker v.

---

[5] Plaintiff's hearsay objections to Oritz's and Jacobson's testimony are overruled because both individuals base their testimony on information obtained from records kept in the regular course of defendant's business pursuant to Federal Rule of Evidence 803(6).

Tenenbaum-Hill Assoc., Inc., 914 F.2d 107, 110 (7th Cir. 1990). The court considers the record as a whole and draws all reasonable inferences in the light most favorable to the party opposing the motion. See Fisher v. Transco Services-Milwaukee, Inc., 979 F.2d 1239, 1242 (7th Cir. 1992).

A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Stewart v. McGinnis, 5 F.3d 1031, 1033 (7th Cir. 1993). This standard is applied with added rigor in employment discrimination cases, where issues of intent and credibility often dominate. See Sarsha v. Sears, Roebuck & Co., 3 F.3d 1035, 1038 (7th Cir. 1993). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." Anderson, 477 U.S. at 252.

## DISCUSSION

Because plaintiff has not offered direct evidence of discrimination in responding to this motion, the court focuses entirely on the burden-shifting requirements for Title VII cases set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under the burden-shifting approach, plaintiff must first establish a *prima facie* case by a preponderance of the evidence. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 505 (1993). To establish a *prima facie* case, plaintiff must show that: (1) she is a member of a protected class; (2) she was doing her job well enough to meet defendant's legitimate expectations; (3) she suffered an adverse employment

10

action; and (4) she was treated differently than similarly situated non-members of her protected class. See Hughes v. Brown, 20 F.3d 745, 746 (7th Cir.1994). Plaintiff's success in establishing her *prima facie* case creates a rebuttable presumption of discrimination, causing the burden to shift to defendant to articulate a legitimate, nondiscriminatory reason for terminating her. See Anderson v. Baxter Healthcare Corp., 13 F.3d 1120, 1122 (7th Cir. 1994). If defendant is successful, the presumption of discrimination dissolves, and the burden shifts back to plaintiff to prove that defendant's proffered reasons are a pretext for discrimination. Id. At all times, plaintiff bears the ultimate burden of persuading the trier of fact that defendant intentionally discriminated against her. See Hughes, 20 F.3d at 747.

In the instant case, the court need go no further than examining plaintiff's *prima facie* case. Defendant argues that plaintiff has not established the second and fourth elements. The court agrees. Plaintiff has not shown by a preponderance of the evidence that she was meeting defendant's legitimate expectations at the time she was discharged. Additionally, plaintiff has not shown by a preponderance of the evidence that she was treated differently than non-members of her protected class.

### A. Defendant's Legitimate Expectations

Defendant argues that plaintiff was not meeting its legitimate expectations due to the various warnings plaintiff received for violating the FDCPA and for behaving inappropriately. Defendant points out that its warnings to plaintiff included a two-day suspension and also required her to retake the FDCPA test. Further, defendant notes, plaintiff cannot claim the warnings are dubious because she never objected to any of the warnings or the suspension and never responded in writing or otherwise that anything about them was incorrect.

Plaintiff disagrees, arguing that her performance was outstanding, as evidenced by her two achievement certificates and the letter of commendation. Plaintiff also cautions the court from relying on the warnings that were given to plaintiff since those warnings were supposed to be removed from plaintiff's employment record upon the passage of a specific amount of time. Plaintiff argues that <u>Gordon v. United Airlines</u>, 246 F.3d 878, 886-87 (7th Cir. 2001), supports her argument and requires the court to deny defendant's motion based on the undisputed facts in the instant case. According to plaintiff, in <u>Gordon</u> the court found: "that there was a fact issue concerning the job performance issue, as the employee testified that he was told that prior violations of company policy were not to remain in the record . . . [and m]oreover, the plaintiff had received job commendations." Plaintiff contends that under these circumstances, it was error to grant summary judgment in <u>Gordon</u> and, accordingly, the court cannot grant summary judgment here.

Plaintiff's rendition of the reasoning in <u>Gordon</u> is so simplified that it is misleading. In <u>Gordon</u>, the Seventh Circuit considered a number of factors unique to that case before concluding that the grant of summary judgment was improper. For example, although the flight attendant plaintiff in that case was fired for committing an "unauthorized deviation" (an offense only one other individual had been accused of in the past—and that person was not discharged), the <u>Gordon</u> court noted that the defendant's agents had "not spoken with one voice in defining what sort of activity by a flight attendant constitutes an unauthorized deviation." 246 F.3d at 886-87. The <u>Gordon</u> court further explained that while it "ordinarily would defer to the definition of the decision-maker in such a situation," the record indicated that the individual who decided to terminate the plaintiff did not come to his own "independent conclusion on the matter

12

but simply accepted the conclusion of lower ranking administrative personnel on this important, indeed key, definitional matter." Id. at 887. Even worse, the Gordon court noted, a genuine issue of fact existed as to whether the plaintiff had even committed the alleged "deviation." Id. Based on all of this, the Gordon court noted (Id.):

> In short, the invocation of an offense that, to this day, [the defendant] has difficulty defining, the lack of any clear management decision that [the plaintiff's] conduct violated clearly established norms, and [the plaintiff's] detailed account that he acted only with the permission of those responsible for the coordination of flight attendant assignments raise a genuine issue of material fact as to whether he had deviated at all from permissible patterns of behavior for flight attendants.

Id. After reaching this conclusion, the Gordon court addressed the defendant's reliance on incidents in the plaintiff's work history that the defendant "affirmatively had assured [plaintiff] . . . would not be used in evaluations of his performance as a [flight attendant]." Id. The court in Gordon seemed to agree with plaintiff that "all but one of these incidents were not relevant to his performance" as a flight attendant, and that the remaining incident was not an "infraction" at all. Id. Based on this, the Gordon court reasoned (Id.):

> Therefore, viewing the record in the light most favorable to [the plaintiff], his personnel file should not have contained a record of any infractions. His personnel file did show, however, many commendations. Consequently, a trier of fact could conclude on this record that [the plaintiff] was performing up to [the defendant's] expectations.

The instant case is distinguished from Gordon in many respects. To begin, the basis for plaintiff's termination was, for the most part, defendant's understanding of how plaintiff handled Debtor's account. Defendant received a call from a representative of USAF, one of its major clients, who reported that plaintiff had called Debtor at work against Debtor's direction. Whether or not that claim was accurate, it is clear that it prompted defendant to investigate and

13

conclude that plaintiff violated the FDCPA and defendant's own internal policies. Defendant also noted that plaintiff had inserted and removed the "J" code from Debtor's computer account several times without indicating in the file that Debtor had given or retracted permission for plaintiff to call Debtor at work.

Further, although plaintiff claims that she was told that two of her prior warnings for FDCPA violations were gong to be thrown out at some point, unlike in Gordon there is no indication that defendant promised plaintiff that the warnings would not be used in evaluating her performance. Plaintiff's written warning states that it "will be in effect for the next 90 days," not that it would be expunged from her record after 90 days and not considered in her performance evaluations thereafter. And, as defendant points out, the same warning also states that, "continued FDCPA violation will result in further disciplinary action up to and including termination." Also, unlike Gordon, the warnings plaintiff received in the instant case were highly relevant to her performance as a collector for defendant. It is also worth noting that plaintiff's warnings followed far more serious infractions in the instant case than in Gordon; being one of two people responsible for reading a safety announcement to airline passengers that was not executed exactly as required is a far cry from violating federal law and possibly subjecting your employer to significant liability and the loss of a major client.

When a court inquires into whether an employer's expectations are legitimate, it is limited to determining whether the employer communicated its expectations to the employee and whether the expectations were reasonable. See Dale v. Chicago Tribune Co., 797 F.2d 458, 463 (7th Cir. 1986). As set forth in great detail in the fact section of this opinion, defendant communicated its expectation that its collectors abide by the FDCPA numerous times and in

numerous different ways to plaintiff. There can be no doubt that defendant's expectation was reasonable. Even so, plaintiff was reprimanded on more than one occasion for failing to follow the FDCPA. Then, on September 9, 1999, defendant received a complaint from Debtor's employer and concluded thereafter that plaintiff violated the FDCPA yet again.

The undisputed facts support plaintiff's claim that she was good at achieving the ultimate goal of her job: collecting money from debtors. Based on this, plaintiff expects the court to conclude that she was meeting defendant's legitimate expectations as well. In essence, plaintiff is asking the court to consider the end she achieved while ignoring the means she used to achieve that end, which is perhaps the most important legitimate expectation defendant had. This the court cannot do. It simply does not matter if plaintiff was the best collector in the history of defendant's company; because plaintiff violated the FDCPA in order to achieve her otherwise admirable results (exposing defendant to significant legal liability and loss of business), defendant had ample cause to be dissatisfied with plaintiff's performance.

The court concludes that plaintiff has failed to establish that she was meeting the legitimate expectations of her employer by a preponderance of the evidence.[6]

---

[6] The Court notes that "the issue of satisfactory job performance often focuses on the same circumstances as must be scrutinized with respect to the matter of pretext." Gordon, 246 F.3d at 886 (citing Denisi v. Dominick's Finer Foods, Inc., 99 F.3d 860, 864 (7th Cir. 1996); Fortier v. Ameritech Mobile Communications, Inc., 161 F.3d 1106, 1113 (7th Cir. 1998)). The reason that defendant gave for finding that plaintiff was not meeting its legitimate expectations-- its belief that her handling of debtors' accounts violated the FDCPA and company policy--is, in part, the reason it gave for terminating her: because it found that her handling of Debtor's account violated the FDCPA and company policy. Plaintiff has presented no evidence drawing into question the honesty of that belief. See Debs v. Northeastern Illinois Univ., 153 F.3d 390, 395 (7th Cir. 1998). As a result, there is no evidence supporting plaintiff's claim that defendant's proffered reason for terminating her was a pretext for discrimination.

## B. Different Treatment than Similarly Situated Non-Members of Protected Class

Next defendant argues that plaintiff cannot establish that she was treated any differently than non-members of her protected class. Defendant relies on Oritz's testimony that from January 1, 1999 to September 10, 2001, defendant terminated 17 people including plaintiff for violating the FDCPA, and of those 12 were male, five were female, three were white, 13 were black, and only plaintiff was Hispanic. Defendant also relies on Jacobson's testimony that, besides plaintiff, of the five collectors terminated from defendant's Skokie facility for violating the FDCPA in 1999, two were white males, two were black males, and one was a black woman. According to defendant, based on the above, plaintiff cannot show that she was treated differently than any similarly situated non-member of her protected class.

Plaintiff disagrees, of course, and points to Jacobson, who is a white male, as an employee not in plaintiff's protected class who was treated differently than she was after calling a debtor at work despite the "J" code appearing on the debtor's account.

Defendant responds to this argument, and the court agrees, that Jacobson clearly is not "similarly situated" to plaintiff; his job title was Manager while plaintiff's was Collector, and he was also plaintiff's boss. See Radue v. Kimberly-Clark Corp., 219 F.3d 612, 617-18 (7th Cir. 2000). Additionally, the individual that plaintiff alleges Jacobson called at work without permission was the very same Debtor whose employer called defendant to complain about plaintiff's conduct. Given defendant's motive to put out the fire that plaintiff had started, Jacobson's actions are also understandable. Further, following his initial call to Debtor, Jacobson did take the time to note in Debtor's computer file that he had received permission to call or fax Debtor at her place of employment thereafter.

Based on the above, the court finds that plaintiff has not demonstrated that she was treated differently than non-members of her protected class by a preponderance of the evidence.

## CONCLUSION

In conclusion, plaintiff has not established the *prima facie* elements of her discrimination claim, negating the need for the court to consider whether defendant's proffered reason for terminating plaintiff was a pretext for discrimination. Defendant's motion for summary judgment is granted.[7]

**ENTER:** **February 26, 2002**

_____
**Robert W. Gettleman**
**United States District Judge**

---

[7] The court expresses its appreciation to plaintiff's appointed counsel, Stephen C. Ascher of the law firm of Lord, Bissell & Brook, for his outstanding work on behalf of plaintiff.